HERLD (RICE v.). See Case No. 11,752.

## Case No. 6,405.

### In re HERMAN et al.

[9 Ben. 436;[1] 17 N. B. R. 440.]

District Court, S. D. New York. April 13, 1878.

BANKRUPTCY—COMPOSITION—PROCEEDINGS TO SET ASIDE—DELAY.

A final order in composition was made in December, 1875. The composition was paid. In January, 1878, the court was applied to, by petition, to set aside the composition, by creditors who had received the amount due by it, on the ground that the votes of other creditors in favor of the composition had been purchased by the bankrupt, by notes given to them before such votes were given, which notes were afterwards paid, so that they received that money in addition to the amount of the composition. It appearing that the attorney who represented the petitioners in the proceedings for composition, was in possession, before the composition was confirmed, of facts sufficient to put him and them on inquiry as to the matters now alleged, in such wise that testimony might then have been taken as to such matters, and that the bankrupts had, after carrying out the composition, entered into a new business, with a new partner, and had incurred new debts, to a large amount, on the faith of the composition and of its payment, before the proceeding to set aside the composition was instituted, and that there had been delay in commencing it after an attorney had been employed to commence it, during which interval the bankrupt had contracted debts, and no notice had, during such interval, been served on him, the court held that it was too late for the petitioners to raise the question as to the purchase of the votes, and refused the application to set aside the composition, without examining that question.

[Cited in Re Shaw, 9 Fed. 497.]
[Cited in Farwell v. Raddin, 129 Mass. 8.]

[This was a petition to set aside a composition in the matter of Moses S. Herman and Simon M. Herman, bankrupts.]

Sedgwick & Curtis, for petitioners.
A. Blumensteil, for bankrupts.

BLATCHFORD, District Judge. The final order in composition herein was made on the 6th of December, 1875. The terms of the composition were forty cents on the dollar in money, payable in three equal instalments, in three, six and nine months, respectively, from the date of such final order, for which endorsed notes were given. The notes were given, and have all of them been paid, except the notes for A. T. Stewart & Co. On the 2d of January, 1878, a copy of a petition to this court, made by the firms of Whittemore, Peet, Post & Co., William Lottimer & Co., Bauendahl & Co., Lewis, Brothers & Co., and Low, Harriman & Co., was served on the attorneys of record for the bankrupts, with copies of three affidavits, and a notice that a motion would be made thereon before this court, on the 5th of January, 1878, that the prayer of such petition be granted. The prayer is, that an order be entered setting

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

such composition aside, or granting a reference to inquire into the truth of the allegations contained in such petition. The petition sets forth, that under said composition the petitioners received only forty cents on the dollar of their claims against the bankrupts; that they strenuously opposed the resolution of composition, and refused to sign it; that their counsel at the time, Messrs. Carter & Eaton, tried, by every argument available, to persuade the register before whom the proceedings were had to grant a postponement of the final vote on composition, in order that the bankrupts might be more thoroughly questioned touching their property; but that they were strenuously opposed by Kaufman Simon, who held a power of attorney from Converse, Stanton & Davis, and others, to the number of eight creditors, and by Seth B. Hunt & Co. and Brigg, Entz & Co.; that the final vote on the composition was taken under the protest of the petitioners; that had it not been for the vote of said Kaufman Simon, the resolutions would not have been passed, inasmuch as the requisite number of creditors required by statute would not have signed the resolution; that the resolution would not have been signed by said Simon had not the bankrupts paid him for so doing; that, within the last week, it has come to the knowledge of the petitioners, that the vote of said Kaufman Simon, and that of Seth B. Hunt & Co., was purchased by the bankrupts, and that the composition was a fraud upon the petitioners; that even without the vote of Seth B. Hunt & Co., the composition could not have passed, inasmuch as the creditors signing the resolution would not have represented the statutory amount required; that the petitioners were morally certain that the proceedings were fraudulent, and that the bankrupts could have paid much more than they did in composition, and that the composition was not for the best interests of all concerned, at the time of the passage of the resolution, but that all thorough investigation of the matter was arbitrarily suppressed in the manner before detailed; that the petitioners, immediately on being apprised of the facts set forth in the affidavits annexed to the petition, took steps to investigate the circumstances as to which they were informed; that the investigation of the affairs of the bankrupts' firm, even at the time of the passage of the composition, showed that they had not accounted for a large amount of goods in their list of assets, but it has been only within the last few weeks that the petitioners have received any information touching the disposition of such goods, sufficiently definite to present to the court; that they have used the utmost diligence in presenting said facts as soon as they became possessed of them; and that the bankrupts' firm, after the composition, started in business again, with an immense stock of goods, and are now abundantly able, as the petitioners believe, to pay their creditors in full. The petition is signed by a member of each of the petitioners' firms, and is verified on the 27th of December, 1877, the signature and verification on the part of Low, Harriman & Co. being made with the statement that they, by their attorney, voted for the composition, and did not oppose it, but that they would not have signed it had the circumstances set forth in the petition been brought to their attention.

The petition and affidavits were presented to the court in accordance with the notice of motion, and the bankrupts appeared and filed an answer to the petition and an affidavit, and, under an order of reference, proofs have been taken as to the matters in issue, on notice to the attorneys for the bankrupts, and to all the creditors named in the statement of debts filed by the bankrupts in the composition proceedings.

It appears by the composition proceedings, that Mr. S. B. Eaton, of the firm of Carter & Eaton, represented in those proceedings the four of the petitioners' firms which did not vote for the composition. The answer sets forth, that Carter & Eaton examined the bankrupts at full length, and were not obstructed in such investigation; that the vote was taken only after Carter & Eaton had stated that they desired to make no further inquiries; and that such examination was not opposed by Kaufman Simon, or any one of the creditors of the bankrupts. The answer denies the payment by the bankrupts to Simon, or any one else, of any money as an inducement to vote for the resolutions of composition, or to assent to their passage. It denies that the composition was fraudulently procured to be passed, or that any vote was purchased. It avers that the amount of the compromise was fixed and recommended by a committee of creditors, of which Mr. Low, of Low, Harriman & Co., was one, and after a thorough examination into the affairs, books and assets of the bankrupts. It denies that there was any concealment of goods, and avers that the assets with which the bankrupts started in business again were those set forth in the statement, or the proceeds thereof, and none other, together with the capital supplied by a new partner, and money subsequently borrowed. It alleges, that the final order was entered more than two years ago; that, shortly after the passage and recording of the resolutions, the bankrupts engaged in a new and different business from that theretofore conducted by them; that they paid the composition promptly, according to its terms; that, since then, they have created a large amount of new debts and new assets, obtained and incurred on the faith of such final order and such compromise; and that not only will said new claims and assets be greatly prejudiced by this proceeding, but the credit of the bankrupts will be greatly impaired thereby.

The record of the composition proceedings

shows that the first meeting of creditors was held on Saturday, the 13th of November, 1875; that Mr. S. B. Eaton appeared for ten creditors (including all of the present petitioners except Low, Harriman & Co.); that an adjournment was had to the 15th of November, to allow Mr. Eaton to make inquiries of the bankrupts; that Mr. Eaton, on the 15th, examined Moses S. Herman on oath, who, at the conclusion of his examination, signed his deposition; that Mr. Eaton then asked an adjournment for two days for the purpose of applying for an order for the examination of Mr. Field (the book-keeper of the bankrupts), and of Mr. Simon; that the register held that a sufficient reason for the adjournment was not shown and refused it; that the vote was then taken; that the composition was passed and confirmed by the requisite number and amount of creditors; that the papers were presented to the court and an order entered on the 20th of November, for a second meeting of creditors; and that the second meeting was appointed for, and held on the 29th of November. The files of the court show, also, that on the 26th of November, Mr. Eaton, as solicitor and attorney in fact for the creditors for whom he was acting (and which number included all of the present petitioners except Low, Harriman & Co.), presented to this court a petition setting forth that he represented claims amounting to about $35,000; that the total debts of the bankrupts were $199,681.06; that the clients of Mr. Eaton were opposed to the composition; that the first meeting for composition was held on the 13th and adjourned to the 15th, when it was closed after lasting from 10 o'clock a. m., to 6 p. m.; that Mr. Eaton was present at such meeting representing creditors as aforesaid, and opposed the composition; that when Moses S. Herman, the senior partner of the bankrupts, was under examination, Mr. Eaton asked of him the following questions and obtained the following answers: "Q. When did your firm take stock since December last? A. Not at all, the stock was taken by the committee. Q. What was the result of that stock-taking, as showing your surplus or your deficit? A. I have to refer to the expert who examined our books. Q. He made an examination after your failure? A. He did. Q. Please give his name? A. Mr. Albert O. Field;" that on the same examination of the bankrupt, the following testimony appeared of record, being questions asked by Mr. Eaton and answers made by the said bankrupt: "Q. Have you the statement of the committee who examined your affairs after you became bankrupt? A. I have not. Q. Who has it? A. I don't know. Q. Was Mr. Field the expert who went through your books on that occasion? A. Yes, sir;" that the books of the bankrupts showed that their surplus in business on the 31st of December, 1874, was $12,930.52; that they had now failed for $200,000 and offered to pay only forty cents on

the dollar and on long time; that, when Mr. Eaton asked the bankrupt the questions above given, he believed he could obtain from the said bankrupt, facts showing a fraudulent concealment and a fraudulent disposition of his property; that at the close of said examination, Mr. Eaton asked for an adjournment for forty-eight hours to enable him to apply to the court for an order to examine Mr. Albert O. Field, above named; that this application was refused by the register, and the vote on the resolution was taken immediately afterwards and the first meeting ended; that a committee of creditors was appointed to examine into the affairs of the bankrupts immediately after their failure; that Kaufman Simon was secretary of that committee; that Mr. Eaton was informed and believed that said Simon made a careful examination into the affairs of the bankrupts and publicly stated to many of the creditors of said bankrupts that the proposed composition of forty cents on the dollar was less in amount than said bankrupts should pay and said creditors should accept; that Mr. Eaton was further informed and believed that said Simon was thoroughly acquainted with the secrets of the business of the bankrupts' firm, and was conversant with such taking of stock, and with the report of such committee; that at the close of the examination of said bankrupt, when Mr. Eaton asked for such adjournment of two days, he stated that he wished to apply for an order of the court to examine Kaufman Simon as well as said Field, but the register declined to grant the adjournment and immediately took the vote on the composition resolution and adjourned the meeting; that Mr. Eaton voted against said resolution; that important facts showing the frauds perpetrated by the bankrupts, and showing that the composition offered was less than it should be, and was, therefore, not for the best interest of the creditors, could be elicited by the examination of said Simon and said Field; and that Mr. Eaton wished to use such facts before this court against the composition when the report of the second meeting should be filed. The petition prayed for an order for the examination of said Field and said Simon at the second meeting for composition. On that petition an order was made by the court on the 26th of November, that Albert O. Field and Kaufman Simon be examined in this matter at the second meeting for composition, and that a copy of such order be served on said Field and said Simon directing their attendance at said second meeting for the purpose of said examination. The record of the proceedings on the second meeting shows that both of the bankrupts attended it in person; that the creditors represented by Mr. Field were present by Mr. Field; that no other creditor attended; that no objection was made that the composition resolution had not been passed in the manner directed by the statute; that the resolu-

tion had been confirmed by the requisite signatures, being sixty-nine out of ninety-four creditors exceeding $50, and $142,136.28 of indebtedness out of $199,681.06; and that it was agreed by the creditors of the bankrupts represented at said second meeting, that it was for the best interest of all concerned that the composition resolution should be recorded and that the statement of assets and debts should be filed.

On the proofs there is no evidence to support the charge of a concealment of goods, and the case is presented to the court on the question of the purchase of the votes cast by Kaufman Simon, which were ten in number and included that of Seth B. Hunt & Co. It is quite apparent, from the proofs, that it was for the best interest of the creditors to take the composition offered.

On the question of the purchase of votes the position is taken on the part of the bankrupts, that, no matter what the conclusion may be on that subject, on the evidence, it is too late for the creditors who present this petition to raise that question now.

It appears from the testimony of Mr. Stiastney, one of the firm of Bauendahl & Co., that Messrs. Carter & Eaton reported to Bauendahl & Co. at the time of the composition meeting, "that there were certain creditors who had been bought, and without them the composition would not have been carried," although the names and number of the creditors were not stated; and that, on the 27th of November. 1877, Bauendahl & Co. made a payment of money to the attorney for the petitioners towards his compensation in the present proceeding and with a view to have it brought.

It appears from the testimony of Mr. Eaton, that he did not attend the second meeting because of his belief "that it was impossible to defeat the composition, for the reason that the bankrupts, or their friends, would buy themselves through." He says: "The circumstances under which Brigg, Entz & Co. and Seth B. Hunt & Co. and some other firm whose name I do not now recall, changed their decision from one against the composition to one in favor of the composition impressed me with a feeling that the composition was being carried through by corrupt means. The vote on the statutory amount was exceedingly close, and during the first meeting there was a continual running in and running out on the part of the attorneys and friends of the bankrupts, followed by revocations, or certainly by a revocation, by means of which, as I recollect, the vote was changed from one fatal to the composition to one in favor of it." He further says, that his impression was that something corrupt was being done in the way of the purchase of votes; that he considered it would be impossible to get at the bottom facts; that, if there was any corruption, he considered that the attorneys in charge of the bankrupts' case would so manage the matter as to evade de-

tection; and that that was his impression at the first meeting. Then occurs the following testimony: "Q. You knew, Mr. Eaton, what creditors there were who had changed their powers, didn't you? You knew that at the first meeting? A. I knew some. Q. You were present at the vote, were you not? A. I think I was. Q. Why didn't you individually examine those creditors who you believed had been purchased by corrupt means, between the first and second meetings? A. My first reason was that one of the parties, for instance, Brigg, Entz & Co., had been my clients, and, if they chose to sell me out, I did not choose to pursue them for it. Beyond that, it is a species of practice for which I have no fondness, and my clients not being particularly desirous that I should do it, I did not do it. Beyond that, I considered it substantially a hopeless case, as I had no doubt, in my own mind, that whatever was done was done in such a way as to avoid illegality or, certainly, discovery. Q. How do you know that your clients were not desirous that you should follow this matter out? A. I am not certain whether we called a meeting for that or not. Q. Give your best recollection, Mr. Eaton? A. Perhaps my best answer is that if they had been desirous I certainly should have done so. Q. You have stated that they were not desirous. Is there any fact in your recollection that they were not desirous that you should prosecute the matter any further? A. Perhaps a better expression would be, that they manifested no desire, although I fail to recall the circumstance. Q. Did you state to your clients your impression as to the manner in which you thought this composition had passed? A. I do not remember. Q. Did you make any statement to your clients as to the result of these proceedings at the time? A. I do not remember. Q. What is your recollection about it? Have you any recollection on the subject? A. I have a very faint recollection. Q. Give us the faint recollection, if that is the best you have. A. It is that I called upon certain ones of my clients. Q. Name them, if you can. A. Whittemore, Peet, Post & Co., but I do not even remember who it was that I saw there. My impression is that they were very conspicuous in opposing the composition. Whether I actually called upon them or not I am not certain about. Q. Is that all the answer? A. That is all. Q. Then, may I understand from you that you made no efforts whatever from the date of the first meeting, from the close of the first meeting, up to the time that the resolutions were confirmed, to examine any party in reference to the manner and the reasons of their voting, or of changing their power, or of revoking the power originally given to you or your firm? A. Such is my impression. Q. And subsequent to the confirmation of the resolutions down to the present time, what efforts have you made to discover the alleged fraud? A. None whatever."

Mr. Whittemore, one of the firm of Whitte-

more, Peet, Post & Co., testifies that he was informed, at the time of the composition, of the suspicions that were entertained by Mr. Eaton as to the manner in which the composition was passed; that the information was that there were parties that opposed the composition, and that at last they came in and voted for it; that his impression was that those parties had been bought off; that the general feeling was that money had been paid to purchase those votes; and that at the time he did not hear any mention of the names of the parties who had changed their votes, but he supposed there were parties who had been bought off and had been paid more.

It appears, from the proofs, that, after the composition had been carried out, the bankrupts engaged in a new business, with an additional partner, and obtained new assets and incurred new debts; that one of the bankrupts borrowed $25,000, which he still owes, and that such money was borrowed and lent on the faith of the fact of the compromise, and with a view to its employment in the new business; that the new partner put in money as capital; that the composition notes were paid out of the proceeds of the assets of the old firm; that, during the one month which elapsed between the time the attorney who conducts the present proceedings was employed to do so, and the time the bankrupts were first notified of these proceedings, they purchased between $10,000 and $15,000 worth of goods, and borrowed about $10,000 in money; that about $20,000 of that is still unpaid; and that the new indebtedness of the bankrupts, individually and as a firm, existing at the time these proceedings to set aside the composition were instituted, was $100,000 and over, incurred on the faith of the composition and of its payment.

In view of the foregoing facts, this is not a case where it would be proper to exercise the discretion of the court to set aside this composition. The facts which were before Mr. Eaton at the time, coupled with his suspicion that those facts indicated that money was being paid to purchase votes, were sufficient to put him and the creditors whom he represented, on further inquiry. The creditors whose votes it was seen were changed, and the attorneys who cast such votes, might have been examined. Mr. Simon is the witness whose testimony is mainly relied on as showing the purchase of his votes by money paid to him, and it is claimed that the testimony shows, that, before the vote on the composition was taken, Simon received notes, as a consideration that he should vote in favor of the composition, for the creditors whom he represented, which notes were afterwards paid; that, before receiving the notes, he had refused to vote for the composition; and that, after he received them, and because he had received them, he voted in favor of the composition, on behalf of all of his constituents. Mr. Eaton obtained a special order for the examination of Mr. Simon, but made no use

of it. It must be presumed, that, if Mr. Simon had been examined at the second meeting of creditors, as to the matters which had excited the attention of Mr. Eaton, the matters now disclosed by Mr. Simon would then have been disclosed, as to the giving of the notes, as they are claimed to have been given before the first meeting in composition was held. If the examination had been had, and what is claimed now to be proved had not been disclosed, all would have been done that could then have been done, and the creditors who opposed the composition would stand differently. Under the above circumstances the opposing creditors accepted the composition payments. In view of the above facts, and of the further delay of a month after an attorney was employed for the present proceedings, without any notice being promptly served on the bankrupts, and of the great injustice which would result to the new creditors of the bankrupts, it would not be an exercise of sound discretion to disturb this compromise. In admiralty, where a lien is to be enforced, to the detriment of a purchaser for value, without notice of the lien, the defence of laches is held valid under a shorter time and on a more rigid scrutiny of the circumstances of the delay, than when the claimant was the owner at the time the lien accrued. The Key City, 14 Wall. [81 U. S.] 653. This principle is applicable to cases like the present. The present assets of these bankrupts are free from the debts embraced in the composition. To reinstate those debts as against those assets is substantially to enforce a lien against them, to the detriment of the new creditors, who occupy the position of purchasers for value without notice. In bankruptcy proceedings, both in England and in the United States, where the question is one of the exercise of discretion, laches of the kind existing in this case, especially when coupled with injury to innocent parties, is a circumstance always of controlling weight. Ex parte Banfield, 1 Ch. App. 154; Ex parte Davis, 2 Ch. App. 363; Ex parte Savin, 1 Ch. App. 616; Ex parte Williams, L. R. 10 Eq. 57; In re Sullivan, 36 Law J. pt. 1, Bankr. 1. In Re Thomas [Case No. 13,891], the principle was applied to a petition to set aside an adjudication for fraud. In Re Murray [Id. 9,953], in the circuit court for this district, it was applied to a petition for the review of an order granting a discharge. There had been a delay of nearly five months in taking proceedings for such review, and in the meantime the bankrupts had, with the assistance of their friends, engaged again in business. The court held that the delay was unreasonable, and added, that "to revoke the discharge which was granted to them in the regular course of the administration of the bankrupt law [of 1867 (14 Stat. 517)] would involve in misfortune not only themselves, but others. who, relying on their discharge, have aided them or entered into new business relations with them. See, also, In re Ewing [Case No.

4,588]. For the foregoing reasons the application to set aside the composition is refused, with costs to be paid by the petitioners.