## *In re* SHAW and another, Bankrupts.

*(District Court, S. D. New York.* October 18, 1881.)

1. EXECUTED COMPOSITION—ATTEMPT TO SET ASIDE—SALE BY THE BANKRUPT OF HIS STOCK—INADEQUACY OF CONSIDERATION.

> In a proceeding to set aside a composition in bankruptcy after it has been fully executed, a sale of the bankrupt's stock and fixtures, made prior to the adjudication in bankruptcy, will not be disturbed on the ground of inadequacy of price in a doubtful case, nor upon other grounds known to the creditors accepting the composition, although it might probably have been avoided by an assignee in bankruptcy.

2. SAME—SAME.

> A creditor, who, with full knowledge of the schedule estimates, voted for the composition and received payment under it, is precluded from seeking to set aside the composition for mere inadequacy, or because it ultimately turns out that a larger amount might have been offered and paid, where the schedules show with substantial correctness the situation of the estate.

3. SAME—ASSETS—BANKRUPT'S RIGHTS WITH RESPECT THERETO.

> A bankrupt from whom a composition is received is necessarily at liberty to deal with his assets as he chooses. The creditors have no concern in the matter if their composition be paid and no fraud practiced. He may pledge or sell his stock to one or more of his creditors to raise money to pay the composition, where there is no concealment practiced, or unfairness to others.

### In Bankruptcy.

This was a petition filed in this court on the twenty-sixth day of June, 1877, by Frederick M. Peyser, to vacate and set aside a composition made by the above-named bankrupts with their creditors, confirmed by an order of this court on the first day of December, 1875, and to vacate and set aside the discharge of said bankrupts from their debts. The bankrupts were a firm engaged in the manufacture of blank books in the city of New York. On or about the seventh day of August, 1875, being unable to meet the payment of all their debts, they sold all their stock and fixtures to their clerk, Randolph

N. Smith, receiving therefor his notes and a chattel mortgage on all the said stock and fixtures as collateral security for the payment of the notes. On the twenty-first day of August, 1875, the bankrupts filed in this court their petition in voluntary bankruptcy. All subsequent proceedings were regularly taken. The notes and mortgages were entered on the schedules as a part of the assets of the bankrupts. The petitioner herein was present at the meetings of the creditors, voted for a composition of 15 per cent. in cash, and received full payment under such composition. The L. L. Brown Paper Company and the Whiting Paper Company were among the largest creditors of the bankrupts, and favored the composition. L. L. Brown and William Whiting were the active representatives of said companies, and they individually advanced the money needed to pay the debts of the bankrupts under the composition, and received in return therefor the assets of the bankrupts. The other facts sufficiently appear in the opinion.

*A. J. Taylor*, for bankrupts.

*Geo. H. Black*, for petitioners.

BROWN, D. J. The sale of the stock and fixtures to Smith, for the sum of $58,228.50, would not be disturbed on the ground of inadequacy of price. This sum is more than there is any probability an assignee in bankruptcy could have made out of the property; and the evidence does not show its value was any more than that, if as much, considered as a gross sale of the whole stock in bulk. The sale is shown to have been a device merely to avoid immediate sale on execution in suits pending against the firm. On this ground it might probably have been avoided by judgment creditors, or by an assignee in bankruptcy; but it was in fact made, as the evidence shows, in the interest of the general creditors, and was, doubtless, so regarded by them. Smith was an employe of the firm. His notes, secured by mortgage on the stock, represented the whole price, and the possession was practically unchanged. It is scarcely possible that any creditor could have been deceived or misled by this thin disguise; and had there been any desire to disturb the arrangement so made, the creditors would have proceeded to choose an assignee in bankruptcy to set it aside. Instead of doing so they voted almost unanimously to accept a composition of 15 per cent. This was done with full knowledge of all the essential facts. The notes represented the full value of the stock. The schedules and the chattel mortgage apprised the creditors of the main facts; and had they desired any further information they should have examined the bankrupts before accepting the composition, as the law provides they may do, and intends they shall then do, as to any mattters concerning which further information is needed. Section 5103; *Ex parte Walter*, 34 L. T. (N. S.) 701.

There is nothing, however, in the evidence, even as it now appears, so far as respects the amount of the bankrupt's estate, which would vary essentially the apparent amount of assets. The schedules showed about $70,000 estimated assets, of which $58,000 were notes of Smith, secured by the mortgage, being about 30 per cent. on the entire indebtedness; and that is the amount of dividend which Peyser, the petitioner, testifies Shaw told him the estate would pay. Page 453. The creditors, including the petitioner, with all this in full view, nevertheless voted to accept 15 per cent. cash, and the composition was approved by the court and paid. If any creditor was dissatisfied, on the ground that the estate would net a sum more nearly approaching to what the schedules showed, viz., twice the amount offered as a composition, it was his right and his duty to present his objections at the time. Least of all can a creditor, who, like the petitioner, voted for the composition and received payment with full knowledge of the schedule estimates, and after being told by the bankrupts that the estate would pay 30 per cent., be now heard in seeking to set the composition aside for mere inadequacy, and because the amount so offered and paid was not as much as the schedules indicated might have been offered; and the evidence does not prove any better condition of the assets substantially than the schedules indicated, if in fact as good. In the figures exhibited as to the subsequent business, no account is taken of expenses. *In re Herman,* 17 N. B. R. 440; *In re Marionneaux,* 13 N. B. R. 222.

The only additional ground for setting the composition aside is, as the petition alleges, that two creditors, the Whiting Paper Company and the L. L. Brown Paper Company, fraudulently represented to the petitioner that they were willing to take 15 per cent., whereas they were fraudulently conspiring to procure the assets for their own use by paying other creditors 15 per cent., in order to make their own debt in full. The evidence fails to establish any such design or result, or any case of fraud or conspiracy. Mr. Whiting and Mr. Brown, the active representatives of those two companies, made no representations of any kind to the petitioner, nor, as appears, to any other creditor, except undertaking to see the composition paid. After the adjudication in bankruptcy, these two companies signed the paper for a voluntary compromise at 15 per cent., which was not acted on because the signatures of some creditors, of whom the petitioner was one, could not be and were not obtained. The evidence does not show that anything more than possible proceedings in bank-

ruptcy were contemplated at the time of the sale to Smith. Had the plan alleged by the petitioner been in existence prior to the bankruptcy proceedings, viz., a plan to force a settlement at 15 per cent. for the benefit of Shaw, Whiting, and Brown, it is inconceivable that Shaw, after the bankruptcy, should have told Peyser, as the latter testifies, that the assets would pay 30 per cent. Page 453. This fact proves that there was no such plan, and confirms the direct testimony that the arrangement for paying the composition originated after the bankruptcy, and grew naturally out of the situation.

The evidence shows that these two companies found it greatly to their interest to maintain Mr. Shaw's large trade, if possible, as that was the principal outlet for the sale of their manufactures. They had aided Mr. Shaw before, and now, to keep up their business, Mr. Brown and Mr. Whiting, individually, were willing to advance 15 per cent. cash and take the assets for their indemnity. There is no evidence of concealment, collusion, or unfair advantage on their part over other creditors. At a meeting of creditors at the Fifth Avenue Hotel this arrangement was openly discussed. Mr. Whiting and Mr. Brown were desired to name some sum which they would advance and take the assets, and one other creditor is specified who was desired by them to join in raising the money, but declined.

A bankrupt from whom a composition is received is necessarily at liberty to deal with his assets as he chooses,—that is, his means of payment; and where cash is offered it is to be presumed that it is done by some immediate pledge or transfer of his assets. How or with whom this is effected is wholly immaterial to his creditors, so long as no fraud or unfairness is practiced upon them. *In re Reiman*, 11 N. B. R. 21, 45; *In re Van Auken*, 14 N. B. R. 425; *Ex parte Hamlin*, 16 N. B. R. 320, 322.

From the known fact that Shaw & Co. had no money themselves; that cash was the offered composition,—from the open talk by other creditors with Whiting and Brown in regard to their advancing the money, and the failure to examine the bankrupts in regard to their means of paying the offered composition,—it may fairly be assumed that the creditors generally either knew that Whiting and Brown were to advance the money, or else were too indifferent to make any inquiry on the subject. There being no fraud and no concealment, they are chargeable with knowledge of what they would easily have ascertained upon inquiry. And it could not have been supposed that Whiting and Brown would advance some $30,000 to other cred-

itors except upon some arrangement to take the assets for their indemnity. Under the circumstances of the case the assent of the creditors thereto is, I think, to be plainly inferred; and in what manner they afterwards dealt with the assets, whether forming a company or corporation either with or without Mr. Shaw, is immaterial. Had Brown and Whiting individually been creditors, the case is therefore not essentially different from what an express arrangement between them and the other creditors would have been for them to advance the composition on the strength of the assets. Such an agreement is valid, although those making the advances thereby get paid in full; and such agreements are not infrequent in the English practice. *Bissell* v. *Jones,* 19 L. T. (N. S.) 262; *Ex parte Nicholsen,* 22 L. T. (N. S.) 286.

But Whiting and Brown were not individually creditors of the bankrupts. They stand, therefore, as respects the creditors, in the same situation in which any other persons not creditors would have stood in regard to their right to treat with the bankrupts concerning an advance of money to enable them to pay the composition offered. The assets being fully released by the creditors to the bankrupts by force of the acceptance of the composition, the bankrupts are at perfect liberty to deal with third persons in regard thereto in any way they see fit, and the creditors have no concern in the matter if their composition be paid and no fraud practiced. All were paid promptly in this case, and I see no legal ground, therefore, for interfering with the composition which was accepted and performed. Whether Whiting and Brown eventually made any profits by means of these large advances, which, with the mortgage on the machinery paid off by them, amounted to some $50,000, does not appear, and is immaterial. It does not appear that their own companies have received even the 15 per cent. dividend. But that also is immaterial, as it is their own fault if not paid. The testimony is that during the first two years, notwithstanding their large outlays and the appraisal of the stock at $30,000, in forming the new corporation, the profits of the business were nothing. That they expected to make some profits may be assumed; and that the advance which they consented to make was fixed at a per centage which they thought safe, and such as would leave a margin of profit to themselves, is also to be assumed. To fix that per centage was the very subject of arrangement with the creditors at the time of the composition. In accepting the per centage offered, the creditors bound themselves to the amount thus fixed; and, as everything material is proved to have been known to some,

was matter of common discussion, was without concealment, and easily ascertainable by all who chose to make inquiry, the composition ought not now to be disturbed.

The petition should be dismissed, with costs.